Good morning, your honors. May it please the court, my name is Timothy Scott. On behalf of the appellant, Mr. Rangel-Rodriguez. Mr. Rangel's conviction and sentence should be reversed for two reasons. First, by the way, we're erroneously premised on jury instructions that this court has rejected in the En Blanc case, United States v. Lopez. And secondly, after Mr. Rangel prevailed on an appeal, the district court increased his sentence by 20 months and did so without analyzing whether this increase was sufficient but not greater than necessary to affect justice under 3553. If we reach number the first issue, do we need to reach it and you, and we decide in your favor, do we need to reach the second? No. The court would not have to address the other issues. The sentence would come unbundled because 180 months' worth of sentence was premised on the bring-to counts of conviction. So the court wouldn't have to, is the short answer. The slightly longer answer is that because it's likely that the judge would encounter the same issue, in fact, it's certain that the judge would again look at Mr. Rangel as a Category 6 offender. This court certainly could provide some guidance to the district court because the issue will reoccur and could suggest to the district court or order the district court, for that matter, that it should analyze under 3553 specifically why this 20-month increase is necessary. Except presumably the court will have an opportunity, based on your arguments or whatever other evidence there is or whatever else happens, will have another opportunity to rethink that and deal with it again. So it might go away of its own accord. That's true. That's true. The court certainly wouldn't have to tell the district court about the 3553 holdings, but again, the court could suggest that it analyze it under 3553. So then the next decision juncture is, it seems undeniable, although I will hear what the government has to say, that this instruction was wrong. So the question is really a harmless error question, and that's what would be most useful for you to address. Very well. Error was harmful. On the facts of this case, the erroneous instructions actually did drive the verdict. To be clear, this isn't a case about sufficiency or about whether a hypothetical jury might have decided the case another way. On the facts of this case, this particular jury really did use the immediate destination instruction in order to convict Mr. Rangel. Presumably, they were also instructed on aiding and abetting, right? They were. But even as to the aiding and abetting, the question of when the crime was completed mattered, right? Correct. Correct. And that was the crux of the argument. The trial attorney attempted to argue in closing that it was essentially a completed offense once the aliens had crossed the border. The government objected to that argument, and as a remedial measure, requested and obtained from the district court a specific instruction that said that the crime is not complete until the aliens reach their immediate destination. That's on page 367 of the ER. There was a stand-alone supplemental instruction that was given to the jury saying that the immediate destination instruction was the law. I would suggest to the court that by because it came at a different time in the proceedings, it served to highlight that immediate destination law. The jury grappled with that idea. The jury did not convict Mr. Rangel under any of the arguments that the government has put forth in its brief, that it may have been a concert of action, that he may have had participation before the aliens crossed the border. Those arguments were made. The jury could have convicted on those arguments, hypothetically, had it been persuaded that that was the case, but this jury didn't. Instead, at page 368 of the ER, this jury told the district court, we're having trouble with the immediate destination language. Does it mean Escondido? Does it mean New Jersey? Please give us some guidance. The reason that there's harmful error, to answer the court's question more directly, the reason that there's harmful error is because the district court then compounded the error under Lopez by saying the immediate destination is wherever the aliens were going to be dropped off in exchange for payment, which according to the alien's testimony would have either been Escondido or would have been New Jersey. That was a second and more specific misstatement of the law under Lopez. It was only after receiving that second instruction that the jury did, in fact, convict Mr. Rangel. So to summarize, whether a hypothetical jury may have convicted on these facts is somewhat beside the point. The fact is this jury did not. This jury convicted Mr. Rangel on the immediate destination instruction. So insofar as Lopez leaves things in some confusion, which it seems to me that it does, with regard to whether you could find an aiding and abetting violation for essentially arranging to be the transport, arranging in advance with the people who are doing the smuggling across the border to be the transporter once they get here, I, whether that could or couldn't be an aiding and abetting offense, we shouldn't be worrying about, essentially. Correct. Correct. That's all grist for the retrial, presumably. Correct. That would be no doubt a heated battle. Yeah. That we'll have at the district court level if this case is reversed, whether some parts of Ramirez-Martinez remain in effect, whether this concert of action theory retains its viability. All of those are excellent questions, and they're sort of cutting edge 1324 issues, but yes, they're beside the point in this appeal, and they're something that we would  Secondly, if the court chose to present some guidance to the district court on the 3553 issue, the crux of the problem was that once Mr. Randhell prevailed on his appeal, he showed up before the district court judge, and all of the circumstances were the same. The judge knew about the conviction, the 1326 conviction, before it sentenced him the first time. The judge even knew to a certainty what the sentence was going to be, and I don't know how well I discussed this in my briefing, but the record reveals, including the PSR, that the district court judge knew that Mr. Randhell had already pled guilty to a two-count 1325 conviction, and as the government would confirm for me, I'm sure, this is sort of the standard plea disposition of an illegal entry case in the Southern District of California. There's a six-month misdemeanor illegal entry count, and then there's a 24-month felony illegal entry count. So the statutory maximum is 30 months. The district court knew, as a matter of the statutory maximum, that Mr. Randhell was going to receive a 30-month sentence. There's no dispute about that. That's what the sentence was. That's all that the sentence could be, and because the guideline range is always significantly higher than that 30-month statutory maximum, there was no possibility that the sentence was going to be anything other than 30 months. So all that remained, and the only thing that changed between the first sentence, when Mr. Randhell received 168 months, and the second sentence, when he received 188 months, was the ministerial task of imposing the 30-month sentence. The die had been cast on every other aspect of that case. At a bare minimum, if the district court felt that the ministerial act of actually imposing the 30-month sentence somehow aggravated factors such that an extra 20 months was appropriate, at a bare minimum, it should have articulated those facts on the record, and it should have explained to this, so that this court had a record to look at, why 168 months was no longer appropriate. It is true, aside from the fact that the conviction could be different, that the atmospherics at this point around the application of guidelines, sentences, is somewhat different after the Supreme Court, recent Supreme Court cases. So it would appear that you would have much more likelihood of convincing the district court the next time around that he doesn't really have to do this if it doesn't make any sense, and also a stronger ground to tell him that he really does have to articulate why he's going to do it if he isn't going to do it. I would hope so. I agree. I would certainly take the opportunity to attempt to persuade the district court judge that it ought not give an extra 20-month sentence. So particularly given the three Supreme Court cases in the last two years, it seems particularly foolish for us to be getting into it at this point. That may be. Again, I sort of, if I had my wish, this court would give some guidance and strongly suggest to the district court that it, at a minimum, articulate why 20 months extra is appropriate. But as a literal matter, I would concede that this court need not reach that issue. As a last point on that topic, I would also point out that the new 188-month sentence was available to the district court the first time around. When Mr. Randhell stood before the district court... Because it was within the guidelines that he did apply. It was. The guideline range was 168 months to 210 months. So at the time of the first sentencing, the district court judge not only had the ability, but indeed it had the obligation to sentence Mr. Randhell to 188 months, if indeed that's what the district court thought was appropriate, was sufficient but not greater than necessary to effect justice. Because 188 months could have been reached before, I think that highlights the fact that the district court erred in imposing that extra 20 months the second time around. Had the 188 months been necessary, then the district court would have presumably done it the first time. What the second sentencing shows is that it was the guidelines and the guidelines alone that determined the sentence the second time around. Absent further questions, I would reserve my remaining time. You may do so. Thank you. Good morning. Good morning. Rebecca Young for the United States. I think what I'd like to do is address the Lopez issue because I know that both Judge Hall and Judge Graber were on the Lopez panel, and that seems to be the greatest concern to this panel. Let me also ask you, we have this new rule that allows everybody to cite unpublished dispositions. Are you aware of Avila, I don't know how to pronounce this, Aguilano, that was decided very recently on this exact issue, and there was a reversal of the brings-to counts? I did pull that case. And I do note that there have been several post-Lopez nondispos in the wake of that. I do think, however, that this is the first time that this court has been presented with an organizer-leader. What? I'm sorry? I do think that this is the first time that this court has been presented with an organizer-leader in a post-Lopez world. And how do we — Yes, but it would be helpful — well, first of all, there is the harmless error issue in the way that it was addressed by the opposing counsel. That is, what do we — even if an aiding and abetting conviction may have been available, do we have any basis for thinking that this jury — or don't we have a basis for thinking that it's fairly likely that this jury was looking at it, that the instruction was very important to the way they, in fact, decided the case? That's point one. But point two is, I found your brief somewhat disturbing, because you were — he does seem to have been a ringleader of something, but it doesn't appear that he was a ringleader of the smuggling operation as such, and that's what you keep saying. He seems to have been a ringleader of the transportation system at this end, but not — there's no indication on the record at all that I can see that he had anything to do with the smuggling across the border itself. What he was — and obviously he received the enhancement for being an organizer-leader — he was absolutely the ringleader of these drivers. Right. And what I did argue in the brief, and perhaps I could have done it better, was that as the ringleader of these drivers, he necessarily had to have communication with other aspects of the alien smuggling organization. Communication, yes, but supervision, no. That's correct. And I'm sorry if I did not state that as clearly as I could. That's what we need to determine is — and absolutely the jury instruction was incorrect. There's no doubt about it. The law has changed. But if the court was to instruct the jury today, post-Lopez, you know, obviously what he would have said is the crime does not end the instant the alien sets foot across the border, but continues until — and here he would quote from Lopez — the initial transporter who brings the alien drops them off at a location in the United States. That's how you would instruct now, taking the language from that case. And so then I think the question becomes, would a rational jury find beyond a reasonable doubt, using that instruction, that that's what the evidence in this case showed? Well, that isn't exactly the question. The harmless error analysis doesn't ask whether a jury could have come to the same conclusion. It asks whether we're confident beyond a reasonable doubt that it would have. Right. Exactly. Which is quite a different question. What you're saying is I can win on remand, you know, if I get to try this case again, and that's terrific. But that really isn't exactly the question that we're faced with when we look at harmless error. You've stated the standard exactly correctly. And what this jury was presented with was exactly that, though. It was presented with somebody who necessarily had communication and organization with the initial transporter. But the jury instructions focused them on something completely different, which now we know isn't the right thing for them to have focused on. Right. So — Well, and I think — and I did address this in the brief. I do think that if we were — if on appeal we were dealing with the drivers of — you know, the drivers that had been hired to transport these aliens, then that would be a different question. Well, that was the Lopez situation. Right. Exactly. Right. What compelling evidence is there, i.e., evidence that would be necessary for us to find that the jury would have found beyond a reasonable doubt that — just a minute — that this person who was organizing the driving at this end and therefore had to have some communications with the people who were smuggling was aiding and abetting the smuggling as opposed to — it seems to me that he's sort of like a fence for — in a theft. That somebody steals something, and they may have a regular fence that they sell it to after they do robberies, but I do not understand the fence to be an aider and abetter of a robbery. Well, I don't know that that — I think if the defendant in this case had been, say, the operator of Stash House, I think the fence analogy might be more fitting. But in this case, given the role that he had, what he had to do in order to coordinate — But there's no evidence of any of that on the record, right? So now we have a harmless error question. There is no evidence on the record of anything he had to do to coordinate, right? Because you didn't put that on because you didn't need to. So we know nothing at all about what he actually did to coordinate, right? What I think that you have is a reasonable inference that there had to necessarily have been coordination before, because as his drivers testified at the trial, he was the one who would inform them what car they would be driving, what password they would be using, where the pickup spot that day was going to be. And all of this coordination would necessarily have to take place either while the aliens were still in Mexico or, at worst-case scenario, while they were still being moved. All right. But if a robber calls the fence on the way back from the robbery and says, we're coming over to sell you some stuff, and let's also say that they wouldn't have even robbed it if they didn't know they could get rid of it, does that make the fence any better of the robbery? Well, but I think what Lopez is now demanding is that we show that the defendant act before that initial transportation has ended. And I think in this case – But acted to, in some substantial way, advance the smuggling, not what happened afterwards. And that's – exactly. But that's what you have here, where unless you've got someone who's making those arrangements, who's coordinating the efforts of the next leg of the relay race, because that's what alien smuggling is, then that act is not going to take place to begin with. You're exactly right. Well, there are smugglers who just take their people across the border and leave them there. That may be, but that's certainly not this case. And with the alien smuggling cases that we do see, what we do see is a coordinated effort, because – and as I did point this out in my brief, you are bringing folks in to a remote, uninhabited, rugged, dangerous area, and you've got to have a location that you are going to, and you've got to have somebody who's going to meet you there, both for safety reasons and to avoid law enforcement. You simply cannot herd a dozen or more people through these areas without thinking – Well, of course you can, and many people do, and that's why people die in the desert. And that's exactly right. So it isn't true that you can't. Maybe it isn't wise, but you can. You can do the smuggling operation without arranging for anybody to go anywhere after that. For a sloppier alien smuggling organization, that very well may be. And we've all heard of those cases. This was not a sloppy organization. This was a tightly controlled, coordinated, concerted effort. That's the evidence that was presented to the jury in this case. And Judge Graber, I mean, I think you're right. The standard when there's an admittedly erroneous jury instruction is a difficult one to meet. But I think this is the unique case, limited to its facts, where we could find that. And I would also note that the government, in its closing argument, highlighted those exact facts for the jury, told them exactly how far back – or reminded them, I should say – how far back the defendant's coordination had to go. So they not only were presented with it, but it was highlighted for them. Well, in fact, under that instruction, it didn't have to go that far back, because his act of driving the people or arranging to have them driven from where they were dropped near the border to wherever they were going would have been aiding and abetting under that instruction. That's right. But that's exactly right. But I think in this case, the government, inadvertently, went above and beyond what they needed to do. And I think they probably put those facts into the record and highlighted those for the jury, probably thinking ahead that we're going to ask that the district court deem him an organizer leader at sentencing, so let's make sure that the jury hears about this and understands that he plays – he's definitely higher up in the organization than, for example, the drivers who testified at his trial. And I was pleased to see that they had done that, because I think in this appeal, that's what saves it, because those facts were presented to the jury. There's no way, obviously, that I can get around the fact that that jury instruction is wrong. There's no way. What we have to then look at is would the jury have necessarily found that under this new law the defendant met that criteria? And I think that's exactly what we showed in this case, not predicting that Lopez would come down, but just fortuitously putting those facts before the jury and having them decide on those. And I can anticipate the follow-up question is if they're given a lesser standard, how do we know that they actually considered those facts? Maybe they disregarded them in toto because they didn't need to consider them given the instruction that the court provided to them. Maybe they disregarded them. But I don't know that that's truly the test at the end of the day. It's the rational jury. And we simply – Actually, isn't the standard this jury? I mean, that is the way it's always stated in the Supreme Court cases, very interestingly. Not some jury, but this jury. And I came across both. And honestly, I'm still unsure. But – and I don't – I do think that defense counsel perhaps reads too much into the jury question. I mean, they did – their question was, well, does it mean the first spot when they arrive in San Diego? It doesn't mean where they ultimately wanted to go to. Other than that, we really have no kind of insight into what that question meant. And I think both sides can read into it what they want to. But I think, again, at the end of the day, we need to look at what was in the record and what was highlighted for them. And in this particular case, it was that he was definitely a bigger fish. And he was definitely acting while that group was still in motion. That's the Lopez test. And luckily in this case, I think we've satisfied it. Are there other issues that the court had questions on or on this issue? I'm just not going to talk about sentencing. I don't think we have any further questions for you, Alice. Did you want to ask about that? I just have trouble with the sentencing. I just wanted to mention that I have trouble with the sentencing for the intentionally and recklessly creating a substantial risk of death or serious bodily harm. I think you've got a real problem in that area. And I would go into that. But we're not going to consider sentencing. Would you like me to address it? No, I think that since you'll have this to do over again. But I find that very clear. I'll go ahead and ask. Where's the link between the risk and his acts? There's a risk. There are his acts. But where's the linkage? Well, and I think when you have an organizer leader, that does become the link, because you are liable for the acts of the drivers in this case that you've hired. And I do need to point out, and I may be incorrect on this. But the district court didn't make that finding, right? You're making that argument, but the district court didn't make that finding. From my understanding, I'm not. I think that was posed in a sentencing memorandum by defense counsel, whether or not he could be held liable for the substantial risk posed by his drivers. All right, so he preserved the issue. Right. What I'm asking is whether the district court, in its factual findings, made the required nexus, made findings about that. I'm not sure. I think he saw it as a legal issue rather than a factual one. Again, as someone who has organized and led this cadre of drivers, is he liable for the way in which they drove? And I think under the guideline sections that I cited, and in addition to the admittedly out-of-circuit cases that I cited in a 28J letter, that that is exactly what happens, both under the substantial risk section of 201.1, and then with the following subsection, which addresses what happens if somebody actually gets hurt or dies. Is the organizer leader responsible for those results? Doesn't the organizer leader have to aid in the particular acts that lead to the risk, as opposed to the overall endeavor? Well, but that's exactly what happened in this case. Oh, no, because we don't have any evidence that you may, if in these cases we try to get to put on the evidence, but at this point we don't have it, that he in any way directed where the people were going to sit in the car or how many people were going to be put in what car. I mean, that may exist, but it's not in the record at this point. I gather sort of subliminally that I was able to define that he seems to have lots of cars and that he seems to supply the cars, whether he matches the cars to the number of people, whether he tells people to put people in the trunk, whether he tells them to put them lying down or anything like that. There's no evidence like that, but there could be, but there isn't at this point. Well, and I don't expect that, actually. I don't expect that. Because what I think the test is and what I think it's already been met in this case is that on the day that that driver drove in a reckless manner, for example, did he arrange that act on that date? And that's certainly in the record. Suppose he said to them, here's a car, but make sure nobody goes in the trunk and make sure nobody lies down and don't drive in a reckless manner. Is he still responsible? But, again, there's no evidence of that. Well, I know, but I'm asking, but your argument seems to be either way he's responsible, whether he told them to do it or told them not to do it or told them nothing. If he had specifically instructed, you know, drive 55, make sure everyone's wearing seat belts, make sure no one's in a compartment, make sure nobody's in the car. Well, we don't know he didn't because there's no evidence either way. That's correct. Though I do wonder if, you know, if that had been an issue, would that have been elicited from the drivers who testified at trial? But it wasn't. But the burden's on you to prove the enhancement, right? That's correct. And you didn't prove that he did say it or that it was neutral or that he didn't say it. Either way, you didn't prove anything about what his relationship was to these acts. That's correct. But what we do have, obviously, is an unobjected two PSR that sets out the factors that led to the substantial risk enhancement and that the court also found. But you're right. That is the state of the evidence. Thank you, counsel. Thank you. Mr. Scott, you can have some rebuttal time if you want to. I'm happy to submit the cause unless the court has any questions. I don't believe that we do. Thank you. The case just argued is submitted. We appreciate the arguments of both counsel.
judges: Hall, Graber, Berzon